## INDUSTRIAL BANK OF ST. LOUIS v. FEDERAL DEPOSIT INS. CORP.

### No. 5518.

United States District Court
E. D. Missouri, E. D.

Nov. 3, 1950.

Frank A. Thompson, Edmonstone F. Thompson, Edgar H. McCullogh and James P. Brown, of the firm of Thompson, Mitchell, Thompson & Young, St. Louis, Mo., for plaintiff.

Jacob M. Lashly and Arthur V. Lashly, of the firm of Lashly, Lashly, Miller & Clifford, St. Louis, Mo., Norris C. Bakke, Godwin Oppegard and John L. Cencil, Washington, D. C., for defendant.

HARPER, Judge.

The plaintiff, a banking corporation, brought this declaratory judgment, seeking a construction of Title 12 U.S.C.A. § 264, as amended, being the Federal Deposit Insurance Corporation Act, hereinafter referred to as the Act. The complaint is in two counts. In the first count construction of the Act was sought to determine whether the plaintiff should be required to pay an assessment for the insurance of its deposits for the period from July 1, 1946, to December 31, 1946, and if required to pay such assessment whether it should be required to include among its average daily deposits for the first 31 days of its operation the deposit liabilities assumed from the Industrial Bank & Trust Company.

In the second count construction of said Act was sought to determine whether "dealer reserves" were required to be included

among average daily deposit balances for assessment purposes.

The plaintiff, a Missouri banking corporation, was granted a charter in June of 1946. Prior to that time an application had been made with the defendant for membership, which application was approved on July 9, 1946, effective as of July 1, 1946. Plaintiff opened for business on July 1, 1946. The Industrial Bank & Trust Company (hereinafter called Trust Company), predecessor of the plaintiff here, was insured by the defendant under the Act from January 1, 1934, until its insured status was terminated on July 5, 1946. Prior to July 5, 1946, the defendant had repeatedly requested the Trust Company to separate its banking activities from its holding company activities. The Trust Company devised a plan for the separation which called for the creation of a new bank (plaintiff). The defendant advised the Trust Company that it would be necessary for the new bank to make application for membership with the defendant, and such application was made. The application was informally approved after the defendant was assured that the plaintiff would not acquire any corporate stock of any description as assets. Before the plan was put into effect all of the holding activities of the Trust Company, consisting of stock in various corporations, which on April 2, 1946, were carried on the books of the Trust Company at a value of $1,-828,000, were partially liquidated and their valuation reduced from $1,828,000 to $204,-000. After this reduction in value, which was accomplished by retiring some of the stock through partial liquidation, the remaining stock was sold to the Industrial Credit Corporation, which was owned by the Trust Company, so that at the time the plan was put into operation the holding activities of the Trust Company consisted solely of the stock of the Industrial Credit Corporation.

The plan was essentially as follows: The Trust Company was to cause a new state bank to be organized under the banking laws of Missouri, with the Trust Company acquiring all capital stock of the new bank except directors' qualifying shares. The Trust Company was to sell to the new bank all of the assets of the Trust Company except the stock of the Industrial Credit Corporation. The new bank was to pay $1 for such assets, plus its assumption of all liabilities of the Trust Company, including deposit liabilities. The Trust Company was to organize a new business corporation under the Missouri statutes, paying up the capital of the new corporation in property consisting of the capital stock of the new bank, plus the stock of the Industrial Credit Corporation, which was carried on the books of the Trust Company at zero. The Trust Company thereafter was to distribute the stock in the new corporation to its stockholders pro rata, and then to dissolve. In accordance with this plan a pro forma application for membership in the defendant corporation was filed by the Trust Company on behalf of the new state bank (plaintiff). On or about June 13, 1946, the plaintiff was granted a charter by the Commissioner of Finance of Missouri. On July 9, 1946, the defendant corporation informed the new bank that its application had been approved, effective July 1, 1946; thus, the plaintiff became an insured bank under the Act on that date. On June 29, 1946, the Trust Company sold and transferred to the plaintiff bank all of its banking assets except stock in the Industrial Credit Corporation, and plaintiff assumed the liabilities of the Trust Company, including its deposit liabilities as provided in the assumption contract. On July 1, 1946, plaintiff opened for business as a bank. Within 30 days after July 1, 1946, the plaintiff gave notice to its depositors (the Trust Company) of the assumption. The defendant received satisfactory evidence of the assumption by the new bank on July 5, 1946, pursuant to the provisions of the Act.

The Trust Company was required by the defendant to pay an assessment on its deposits for the period from July 1 to December 31, 1946. The plaintiff on behalf of the Trust Company made such payment based upon the average daily deposits from January 1 to June 30, 1946.

The defendant demanded that the plaintiff file a certified statement prescribed under the Act on or before August 15, 1946, as a new bank and pay an assessment for

the period from July 1 to December 31, 1946. The plaintiff refused payment of this assessment. On June 8, 1947, the plaintiff deposited with the defendant its certified check for $30,000, of which amount $20,000 was security for the disputed assessment against it as a new bank.

Two questions are presented under the first count: First, was the plaintiff a new bank within the meaning of the Act? Second, if the plaintiff were a new bank within the meaning of the Act, were the deposits assumed from the Trust Company deposits within the meaning of the Act during the period from July 1 to December 31, 1946, for the purpose of determining assessments? If the plaintiff were not a new bank within the meaning of the Act, it is not necessary to pass upon the second question.

■ The purpose of the plan was to create a new bank and to dissolve the old bank (Trust Company), and in accordance with the plan a charter was granted to the new bank (plaintiff). In dealing with reorganization of corporations, the Courts have repeatedly held that it is not necessary that the old and new corporations be identical for the new corporation to be a continuation of the old one, but rather, the new corporation is considered a continuation of the old corporation unless the new corporation is essentially a different corporation from the old one. Weiss v. Stearn, 265 U. S. 242, 44 S.Ct. 490, 68 L.Ed. 1001; H. H. Miller Industries Company v. Commissioner of Internal Revenue, 6 Cir., 61 F.2d 412; Quinn v. American Bankers' Assurance Co., 183 Mo.App. 8, 165 S.W. 823.

In the Miller case, 61 F.2d loc. cit. 414, the court said: "We have here substantial identity of two corporations, with the same capital structure, same officers, and the same assets. Under these circumstances, to hold that they are two distinct taxable entities would be wholly to disregard substance and to emphasize mere form. Courts will not permit themselves to be blinded or deceived by mere forms of law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate entity did not exist, and as the justice of the case may require."

The Missouri appellate court in the Quinn case, 165 S.W. loc. cit. 829, said: "The cases last cited deal with the principle in equity, but the rule obtains alike at law when it appears, as it does here, that the new corporation is in substance nothing more than a continuation of the old one, for in such circumstances the assets and business of the prior company are not only taken over *cum onere* according to the principle in equity by the new corporation but it—that is, the new legal entity—is treated in fact and in law as the same company continuing to exist as before."

■ There was some change in the capital structure between the old and new banking corporations, in that the stock of the Industrial Credit Corporation was not included in the assets of the new banking corporation (plaintiff), but was included as assets of the new business corporation. However, before the plan was put into operation the holding activities of the Trust Company were reduced to approximately one-ninth of their former value. What subsequently occurred was the reorganization of the old corporation (Trust Company). When we consider the capital structure, the assets and liabilities, and other pertinent facts, the conclusion follows that the Trust Company and the plaintiff, both banking corporations, were not essentially different, and that the plaintiff should be considered a continuation of the Trust Company and is not a new bank within the meaning of the Act for assessment purposes.

■ With respect to the second count of the complaint, the question presented is whether "dealer reserves" are deposits as defined by the Act and accordingly to be considered in determining the assessments owed by the plaintiff. Subsection (c) (12) of the Act, insofar as it is applicable, reads as follows: "The term 'deposit' means the unpaid balance of money or its equivalent received by a bank in the usual course of business and for which it has given or is obligated to give credit to a commercial, checking, savings, time or thrift account, or which is evidenced by its certificate of deposit, and trust funds held by such bank whether retained or deposited in any depart-

ment of such bank or deposited in another bank, together with such other obligations of a bank as the board of directors shall find and shall prescribe by its regulations to be deposit liabilities by general usage: * * *."

The court in Federal Deposit Ins. Corp. v. Records, D.C., 34 F.Supp. 600, held that Congress did not change the ordinary use of the word "deposit" in the Act. A part of plaintiff's business is what is commonly known as finance business. Retail dealers in automobiles, home appliances and other consumer goods, take from their credit consumers installment promissory notes, secured by chattel mortgages or conditional sales contracts. In the finance business, as conducted by the plaintiff, the dealer sells installment paper to the plaintiff for an agreed price, which price is less than the face value of the notes. By written agreement entered into at the time between the plaintiff and the dealer all of this agreed purchase price of the paper is not paid by the plaintiff immediately to the dealer, but an agreed portion of the purchase price is held by the plaintiff and placed in "dealer reserves", which is set up as a liability on the books of the plaintiff. By the terms of the written agreement between the plaintiff and dealer, such "dealer reserves" are held as security for installment paper of the dealer, and are usually subject to withdrawal by the dealer when the installment paper for which such reserves stand as security has been paid in full. The following is typical of the applicable provisions of a reserve agreement:

"Whereas, at the time of the purchase, assignment or transfer of any of said accounts the Company (bank) withholds a portion of the purchase price thereof and does not immediately pay the same to Dealer, and it is contemplated that said practice will be continued in the future * * *.

"Now, therefore, it is agreed by Dealer and Company (the bank) that said reserve shall be held as *security* for all the obligations of Dealer to Company incurred by contract or otherwise on or in respect to any or all of said accounts. * * *

"Dealer shall be permitted to withdraw the portion of sale reserve withheld out of the purchase price of accounts when the account out of the purchase price of which the portion of said reserve sought to be withdrawn was withheld shall have been paid in full. * * *

"Dealer shall not be entitled to interest on said reserve. * * * At any time when all accounts shall have been paid in full and all obligations secured by said reserve discharged, Dealer may withdraw said entire reserve."

While there were several reserve agreements introduced in evidence, similar provisions appear in all of the agreements. The plaintiff sets up the "dealer reserves" in question on its books in the accounting department. With each transaction the dealer is given a copy of the bank's discount sheet showing the amount of the deduction for "dealer reserves". The bank from time to time pays the dealer out of the so-called reserve account by issuing him a check, or if the dealer has a checking account with the bank, credits the amount payable to his account. The money in this reserve is commingled with the other moneys of the plaintiff. It is clear that these "dealer reserves", or the account they represent, could not be classed as general deposits. Subsection (c) (12) of the Act does not differentiate between general and special deposits. Under the decision of the Eighth Circuit Court of Appeals in the case of Union Electric Light and Power Company v. Cherokee National Bank, 8 Cir., 94 F.2d 517, "dealer reserves" should be classified as deposits within the meaning of subsection (c) (12) of the Act. The contract in the Union Electric case dealt with what was called deposits, and here we have a contract dealing with what is called "dealer reserves", but in both instances the actual money representing the account was commingled with the general funds of the bank, and there were conditions to be met whereby the depositor, or dealer, was to get his money. In the Union Electric case the bank was to issue its cashier's check, while in this case the bank was to issue its check or credit the dealer's account when the balance between the dealer and

the bank was favorable (although the bank could in some instances hold the balance as security for other transactions). In the Union Electric case the court held that before the cashier's check was issued the funds (although not the same money) were impressed with a trust. It would seem to follow that these nebulous "dealer reserves", before a check was issued to the dealer, would likewise be impressed with a trust. The Union Electric case is authority for the proposition here that this was a special deposit in the usual course of business, or it was a trust fund until a check was drawn or credit given to the dealer's account for the balance due the dealer. It, therefore, follows that "dealer reserves" should have been included in plaintiff's daily deposit balances for assessment purposes.

Attorneys for the plaintiff will submit findings of fact, conclusions of law and judgment for approval, signature and entry.